# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

CHERISH GALVIN-BLIEFERNICH,    )
    )
     *Plaintiff*,    )
    )    Case No. 1:20-cv-266
v.    )
    )
FIRST UNUM LIFE INSURANCE    )    Judge Atchley
COMPANY & UNUM GROUP CORP.,    )
    )    Magistrate Judge Steger
    *Defendants*.    )

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff's Motion to Determine Extent of Deference [Doc. 55] and Motion for Judgment on the ERISA Record [Doc. 59], and Defendants' Motion for Judgment as a Matter of Law [Doc. 65]. For reasons that follow, Plaintiff's Motion to Determine Extent of Deference [Doc. 55] and Motion for Judgment on the ERISA Record [Doc. 59] will be **DENIED** and Defendant's Motion for Judgment as a Matter of Law [Doc. 65] will be **GRANTED**.

## I.    FACTUAL BACKGROUND

Plaintiff Cherish Galvin-Bliefernich was an elementary school teacher for the Eldred Central School District. Defendant First Unum Life Insurance Company (with Unum Group Corp. "Unum") issued a long-term disability insurance policy (the "Policy") to Plaintiff's former employer, Eldred Central School District Faculty Association Employee Benefit Trust. [AR 184].[1] The Policy provides:

> You are disabled when Unum determines that:

---

[1] For ease of reference, the administrative record is cited as "AR," referring to the digits following Bates stamp FUL-CL-LTD, filed as Doc. 18-1, et seq. All other citations are to the electronically-stamped CM/ECF document and page number.

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness or injury**; and
- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

[AR 200]. "Gainful occupation" means "an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work." [AR 216].

The Policy also limits the lifetime cumulative maximum benefit period for all disabilities due to mental illness to 24 months, unless the claimant is confined to a hospital or institution at the end of that period. [AR 206]. It is undisputed that Plaintiff was paid benefits for over 24 months. So, to be entitled to further benefits, she must demonstrate that she is disabled from performing "any gainful occupation." Finally, the Policy grants Unum "discretionary authority to determine [] eligibility for benefits and to interpret the terms and provisions of the Summary of Benefits" when making a benefits determination. [AR 196].

Plaintiff suffered serious injuries when her car was hit by another vehicle on June 16, 2016. She notified Unum of her LTD claim over a year later, on September 13, 2017. [AR 2]. Unum initially denied the claim as untimely, but subsequently reviewed the claim on the merits. [AR 443]. By letter dated December 31, 2018, Unum notified Plaintiff that her request for LTD benefits was approved for the period of September 15, 2016, through December 14, 2018. [AR 1648-51]. Unum found that Plaintiff was unable to perform the demands of her occupation and, for the three months following a July 2018 surgery, was unable to perform the demands of any occupation. [*Id.*]. The letter notified Plaintiff that with the approval of her claim, she received 24 months of

benefit payments. [*Id.*]. It further notified her that starting September 15, 2018, her claim would be evaluated based on her ability to perform alternate, gainful occupations. [*Id.*]. Unum explained that it would continue paying benefits under reservation of rights while obtaining further information. [*Id.*].

### a. Opinions of Plaintiff's Treating Physicians

Plaintiff's medical history following her car accident is extensive, involving numerous treating physicians and specialists and resulting in an administrative record of over 8,000 pages. A brief synopsis of the portions of the record cited by the parties follows. In many cases, the physician was asked to evaluate Plaintiff's ability to perform full-time work based on what Unum identified as Plaintiff's "alternative occupational demands."[2] Though the wording varies somewhat, Unum generally identified Plaintiff's alternative occupational demands as follows:

- Lifting, Carrying, Pushing, Pulling 10 Lbs. occasionally.

- Mostly sitting, may involve standing or walking for brief periods of time.

- The occupations are performed in an office setting and would allow for one to stand up briefly in between tasks such as phone calls and then return to sitting.

- Dealing with people, planning activities of others, making judgments and decisions, attaining precise set limits, tolerances, and standards to record accurate records, performing a variety of duties.

[*See* AR 2981]. These alternative occupational demands are not disputed.

### i. Dr. David Asprinio

Orthopedic surgeon Dr. Asprinio performed pelvic repair surgeries on Plaintiff following

---

[2] It appears that some earlier Unum questionnaires involved a higher level of work capacity, including occasionally lifting, carrying, pushing, and pulling 20 lbs. and frequently sitting. [*See* AR 702-703, Dr. Mathew October 11, 2018]. Later questionnaires dealt with the alternative occupational demands listed – mostly sitting and occasionally lifting, carrying, pushing, or pulling 10 lbs. [*See* AR 2069, Dr. Mathew March 13, 2019].

her accident and continued to treat her through 2018 and 2019. Office notes from January 24, 2017, indicate that Plaintiff was "doing remarkably well" following her surgery. [AR 1399]. Dr. Asprinio notes that an MRI of her left knee revealed articular cartilage injury, but that her symptoms had improved with physical therapy. [*Id.*]. She was advised to continue formal physical therapy. He writes:

> The patient is free to return to all activities which do not require running, jumping, or impact loading. She is aware that she will be capable of returning to those activities post removal of sacroiliac screws. The patient is free to return to work in her capacity as a third grade teacher.

[*Id.*]. After the sacroiliac screws were removed on March 24, 2017, Asprinio noted that since her most recent visit, "the patient has returned to most activities. She does however note continued difficulty with activities such as running." [AR 1366]. As to his physical exam, Dr. Asprinio notes:

> [T]he patient is noted to sit comfortably in hip chair. She rises from a seated to standing position without difficulty. . . . She ambulates with unremarkable gait. . . . Range of motion of the bilateral hips results in no obvious discomfort. Distal neurological examination is intact.

[AR 1366]. With respect to her pelvic ring injury, Plaintiff was advised she was "free to continue all activities on an as tolerated basis." [AR 1367].

About a year and a half later, on October 3, 2018, Unum sent Dr. Asprinio a form questionnaire about Plaintiff's work capabilities. [AR 1195]. Apparently in response to this inquiry, on January 10, 2019, Dr. Asprinio's office told Unum that it was an orthopedic office and that Plaintiff was not restricted from working for the conditions they see her for. [AR 1746].

After a June 1, 2019, visit, Plaintiff reported that in the prior three months, she had experienced "increasing low back discomfort radiating to the left buttocks and left lower extremity discomfort." [AR 2627]. She did physical therapy for this and believed it had possibly aggravated her low back discomfort. She reported she had been able to ski the previous winter. Dr. Asprinio

4

indicates she reported "a lot of pain when walking and sitting, moving a certain way she obtains a lot of pain. She gets pain in the lower back, has gotten shooting pain on the [left] side." [*Id.*]. His physical exam noted: pain with extension and extension rotation, able to sit comfortably, assumes a supine or standing position without difficulty, accomplishes a toe-touch and standing on heels and toes without difficulty. [*Id.*]. His notes indicate she would be referred for an MRI, but that in the interim, she was "free to continue all activities on an as tolerated basis." [*Id.*].

Plaintiff had another visit with Dr. Asprinio on August 1, 2019. He observed she "switches positions frequently with facial grimacing suggestive of discomfort." [AR 2839]. She was again noted to be ambulatory with an unremarkable gait, able to sit down or stand up without difficulty. [*Id.*]. Dr. Asprinio found that her pain complaints were "out of proportion" to his findings on physical examination, radiographs, and MRI of the lumbosacral spine. [*Id.*]. He did not feel she would benefit significantly from either physical therapy or surgical intervention and suggested follow-up with a pain management specialist. [*Id.*].

It appears that Unum attempted to obtain updated information from Dr. Asprinio following these visits. In particular, on August 29, 2019, Dr. James Haller wrote a detailed letter to Dr. Asprinio asking him to again opine on whether or not Galvin-Bliefernich was precluded from working, and if so, identify the basis for any impairment and explain whether he had her on any restrictions. [AR 2800-2802]. It does not appear that Unum received further information.

### ii. Dr. Daniel Zelazny

Dr. Zelazny, also an orthopedic surgeon, performed pelvic surgery on Galvin-Bliefernich following her accident and treated her for knee discomfort in June 2017. [AR 1670]. His December 21, 2017, medical notes state that Plaintiff has osteoarthritis of the knee, multiple closed fractures of her pelvis, and an acute meniscal tear on both her knees. [AR 710]. The notes indicate that at

that time, Plaintiff reported pain in the right knee with soreness, locking, and clicking, as well as joint pain and back pain. [AR 711].

Over a year later, on April 15, 2019, Dr. Zelazny completed a work-capacity letter from Unum. [AR 2293]. He did so in a somewhat unconventional manner. Unum outlined the demands below. Dr. Zelazny made notes in the margins of the list, which are reflected in bolded italics.

- Lifting, Carrying, Pushing, Pulling 10 Lbs. occasionally. ***Yes, occasionally.***

- Mostly sitting, may involve standing or walking for brief periods of time. ***Walking/moving better than sitting.***

- Dealing with people, planning activities of others, making judgments and decisions, attaining precise set limits, tolerances and standards to record accurate records, performing a variety of duties. ***Yes***

- Allow for one to stand up briefly in between tasks such as phone calls and then return to sitting and are performed in an office setting. ***Yes, standing/walking better than sitting.***

[AR 2293]. Dr. Zelazny opined that Ms. Galvin-Bliefernich was able to perform these demands on a full-time basis, but also explained:

> Walking/moving better than long periods of sedentary sitting.
> Rely on other teacher in classroom for assistance when needed.

[AR 2294]. In response to the question "Which of her medical conditions prevents her from performing these demands?", he wrote: right knee medial meniscal tear, right knee degenerative arthrosis. [AR 2295]. He indicated these are lifetime limitations. [*Id.*].

A few weeks later, in a May 2, 2019, visit, Plaintiff reported that her knees had improved since winter had ended and denied buckling, locking, or instability. [AR 2374]. The notes indicate muscle aches and weakness and joint pain, but no back pain or swelling. [*Id.*]. Her physical exam

6

also indicated she was "able to straight leg base bilaterally" and that her range of motion was "full extension to 130 degrees of flexion bilaterally." [*Id.*]. Dr. Zelazny noted that an MRI of her right knee indicated some degenerative changes but no meniscal or ligament tearing. [*Id.*]. They discussed treatment options, but Ms. Galvin-Bliefernich stated that "her symptoms at this point do not warrant intervention." [AR 2375].

### iii.  Dr. Anthony Nici

Dr. Anthony Nici is a gastroenterologist who began treating Plaintiff in 2019. In a June 3, 2019, visit, Plaintiff reported having six to eight bowel movements a day over the preceding three years. [AR 6238]. She underwent a colonoscopy that reported no abnormal results. [AR 6236-37]. Unum contacted Dr. Nici's office and was told that he did not have her on any work restrictions. [AR 2784].

### iv.  Dr. Liby Mathew

Dr. Liby Mathew is Plaintiff's primary care provider. In connection with Plaintiff's initial claim submission, Dr. Mathew completed an Attending Physician Statement on August 10, 2017. At that time, Dr. Mathew listed Plaintiff's primary diagnoses as PTSD, depression and anxiety, knee pain, and sacral and bilateral hip pain. [AR 86-90]. She gave Plaintiff the following restrictions and limitations ("R&Ls"): (1) can only stand for less than 20 minutes, (2) can sit up to 1 hour, and (3) walks with difficulty. [*Id.*].

Fourteen months later, on October 11, 2018, Dr. Mathew completed Unum's form questionnaire regarding Plaintiff's work capacity. [AR 702-703]. She stated that Plaintiff was able to perform the listed occupational demands on a full-time basis, but was unable to lift more than 1 gallon of milk, unable to pull or push, and needs breaks to sit when in pain. [*Id.*].

On March 13, 2019, she completed another form questionnaire, this time evaluating Plaintiff's alternative occupational demands. [AR 2069]. Dr. Mathew opined that Plaintiff was able to perform these demands on a full-time basis as of September 1, 2018. She then explained:

> Patient has severe anxiety around large groups of people & also trouble focusing with them. She is better in smaller groups. Patient also has severe pain back, hips & pelvic area. Unable to lift above 10 lbs or sit or stand for prolonged amount of time.

[AR 2069]. The questionnaire asks "When do you feel she will regain the ability to perform the demands above on a full-time basis?" Dr. Mathew responded: "She will never regain it." [*Id.*].

Unum Onsite physician ("OSP") Dr. James Haller later spoke with Dr. Mathew about her opinion. [AR 2904-2905]. Dr. Mathew confirmed her opinion that Galvin-Bliefernich has the capacity for full-time sedentary work based on the listed physical demands, but noted that Dr. Robinson had indicated accommodations due to PTSD and anxiety. [*Id.*]. Dr. Mathew deferred any opinion on cognitive impairment to Drs. Nanavati and Robinson. [*Id.*].

### v. Dr. Kimberly Robinson

Dr. Kimberly Robinson is Plaintiff's psychiatrist. Unum sent her a form questionnaire about Plaintiff's work capacity, but listed only the cognitive requirements: directing, controlling, or planning the activities of others; influencing people in their opinions, attitudes & judgments; making judgments and decisions; and dealing with people. [AR 1818-1819]. It appears that Dr. Robinson completed the form, but it was never received by Unum and does not appear in the record. Regardless, a Unum representative spoke with Dr. Robinson on March 14, 2019, and she opined that, as of September 1, 2018, Plaintiff could perform her occupational demands. [AR 2058]. She opined that her medical conditions include PTSD, memory issues, concentration, and anxiety and depressive symptoms that periodically worsen and remit. She also stated that Plaintiff still deals with emotional and cognitive issues. [*Id.*].

### vi. Dr. Farzana Nanavati

On September 13, 2017, neurologist Dr. Farzana Nanavati completed an Attending Physician Statement in which she identified Plaintiff's primary diagnosis as post-concussion syndrome. [AR 39-41]. The form notes that she also has ongoing pain related to her injuries, difficulty walking, depression, anxiety, and PTSD. She lists joint pain, difficulty walking, difficulty squatting, abdominal pain, and muscular fatigue as Plaintiff's physical limitations. She also gave behavioral health restrictions: "forgetful, cognitive sluggishness, difficulty shifting attention, feels overwhelmed, anxiety/depression/PTSD," which she estimated would remain until July 1, 2018.

On October 10, 2018, Dr. Nanavati returned a Unum questionnaire regarding Plaintiff's work capacity. She stated that Ms. Galvin-Bliefernich could not perform the listed occupational demands on a full time basis, and is only able to lift, carry, and push less than 5 lbs. [AR 578].

On March 29, 2019, Dr. Nanavati returned another Unum questionnaire. Given Plaintiff's alternative occupational demands, she opined that Plaintiff was not able to perform them on a full-time basis. [AR 2173-2174]. Specifically, Dr. Nanavati opined that Galvin-Bliefernich would not be able to perform the demands of dealing with people, planning activities of others, making judgments and decisions, or multi-tasking. [*Id.*]. She notes that Plaintiff is getting physical therapy for low back pain through another physician and that Dr. Nanavati was not sure of a lifting restriction. [*Id.*].

Dr. Nanavati identified the following medical conditions that prevent her from performing the listed occupational demands:

> Cognitive impairment related to PTSD, depression/anxiety, lack of attention. Patient has difficulty coping with usual stressors of life. Her anxiety has worsened.

9

[*Id.*]. Asked when Plaintiff would regain the ability to perform the demands full-time, Dr. Nanavati opined that her psychiatrist might be a better judge of that. She noted that Galvin-Bliefernich was working at a Montessori school where she was able to "tolerate the demands" and will likely continue to work there as a teacher's assistant. [*Id.*].

In a July 22, 2019, office visit with Dr. Nanavati, Plaintiff reported headaches and that her anxiety had worsened in the prior few months. [AR 2734-2735]. She also reported, *inter alia*, abdominal pain and diarrhea, muscle aches, joint pain, back pain, and muscle pain. Dr. Nanavati noted that Plaintiff was in distress and in tears during the visit. [*Id.*]. With regarded to postconcussion syndrome, Dr. Nanavati noted that "she should be in a work environment that is not too much of a challenge to her executive function (as recommended by psychologist)." [*Id.*].

OSP Dr. Haller spoke with Dr. Nanavati on September 20, 2019, noting Plaintiff's driving, cleaning, yard work, and full-time work as an assistant teacher. [AR 2930-31]. Dr. Nanavati stated that her impairment opinion remained the same: she believed Plaintiff has a cognitive impairment as a result of her PTDS and depression/anxiety. [*Id.*]. She deferred any opinion on capacity for physical demands to Plaintiff's orthopedic provider. [*Id.*].

### vii. Dr. Nelson Wong

On August 15, 2017, Dr. Nelson Wong, a pain management specialist, completed an Attending Physician Statement identifying Plaintiff's primary diagnoses as PTSD and chronic pain. [AR 100-104]. For her physical restrictions and limitations, he stated that Plaintiff could only stand or walk occasionally, roughly 33% of the time.

Over a year later, on October 3, 2018, Unum sent a work capacity questionnaire to Dr. Wong. [AR 1113]. He responded that he was not able to complete the request because he had not seen Plaintiff in the office since September 17, 2017. Plaintiff saw Dr. Wong again almost a year

after that correspondence, on September 18, 2019. [AR 2918]. In apparent response to an August 2019 letter from Unum, Dr. Wong sent a letter to Dr. Haller on September 23, 2019. [AR 2950]. He did not state whether he believed she was disabled from the identified occupational demands. He said that she reported she had returned to work, complained of "limiting pain at her prior surgical site" and was referred back to Plaintiff's trauma surgeon, and that she appeared to have some psychological stressors. He deferred assessment on those stressors to an expert in the field.

### viii. Robin Engels

Licensed clinical social worker Ms. Robin Engels counseled Plaintiff. On December 12, 2018, she returned Unum's questionnaire, which identified the same cognitive occupational demands listed in Unum's letter to Ms. Robinson (i.e. directing the activities of others, making judgments and decisions, etc.). [AR 1539-1540]. She stated that Plaintiff was able to perform the listed occupational demands as of September 1, 2018. She indicated that Plaintiff had PTSD and memory/concentration issues as a result of her injury (traumatic brain injury). She also had anxiety and depression symptoms that would periodically worsen and recede.

### ix. Dr. Anthony Policastro

Dr. Anthony Policastro is a trauma surgeon who performed Plaintiff's lumbar hernia repair. He did not complete the questionnaire sent to him by Unum, instead referring to his records from, *inter alia*, a December 3, 2018, postoperative evaluation of the hernia repair. He notes irritable bowel syndrome with both constipation and diarrhea, "continue to transition to full activity." [AR 1587]. His notes indicate she denied having fatigue, backaches or joint pain at the time. [AR 1586]. His general examination notes indicate she had a normal gait and normal muscle strength and that she was alert and oriented, but with mild anxiety. [AR 1587]. A prior note from August 13, 2018, indicates "patient appears to be doing extremely well postop." [AR 1590].

11

### x. Dr. Terri Copans

Neuropsychologist Dr. Terri Copans conducted neuropsychological evaluations of Plaintiff in 2017 and 2019. [*See* AR 2664-2669]. The 2017 testing indicated "possible mild decline in certain executive functions." [AR 2664]. In the 2019 evaluation, Dr. Copans noted some of her scores dropped in the areas of impulse control, distractibility, and train of thought. [AR 2668]. Because it would not be expected for her cognition to worsen from a brain injury 3 years before, he opined that it was possible that her increase in PTSD symptoms and decrease in executive function were related. [*Id.*]. As she continued to address PTSD symptoms and given the apparent worsening of her symptoms, Dr. Copans recommended she remain in an environment that does not challenge her executive function too much. [*Id.*].

### xi. Heather Carpenter-Sarmiento

Clinical psychologist Heather Carpenter-Sarmiento saw Plaintiff twice monthly beginning in July 2018 for individual psychotherapy. [AR 2045]. She wrote a March 12, 2019, letter to Unum to "advocate for her disability request." [AR 2045-2046]. She supported Galvin-Bliefernich's request to continue to work in her current capacity at the Homestead School. She opined:

> In her current work environment, [patient] benefits from a smaller class size, close proximity to her home, and the ability to attend her medical appointments without penalty. Contrary to the public school setting, Ms. Galvin Bliefernich's job is supportive and flexible to her needs.

[*Id.*].

### xii. Physical Therapy

In addition to treatment from numerous physicians, Plaintiff did physical therapy from November 12, 2018, to April 11, 2019. At her last session, she reported she continued to have soreness in the trunk on the right side. She reported she was attempting to increase her activity at home, but noticed increased discomfort. [AR 2450]. Many of her physical therapy goals had been

12

met, including the ability to walk on all surfaces and stand in good posture. [*Id.*]. Several were marked as "progressing," including the ability to bend, lift, and carry 20 lbs., and the ability to return to all household and work activities with minimal discomfort. She was discharged "due to improvement and ability to continue with a home exercise program." [AR 2451].

### b. Unum's Review

Unum had four physicians review Plaintiff's medical records: OSP Dr. James Haller, OSP Dr. Jonathan Morris, outside designated medical officer ("DMO") Dr. Mirielle Diaz-Molina, and outside neuropsychologist Dr. David Nowell.

### i. Dr. James Haller

In a September 20, 2019, report, Unum Onsite Physician Dr. James Haller opined that Plaintiff is not physically limited from performing her alternative occupational requirements, as identified by Unum. [AR 2925-2927]. The review only addresses Ms. Galvin-Bliefernich's physical functional capacity, as the mental illness benefits maximum had already been reached. Dr. Haller noted:

- Dr. Asprinio opined that Plaintiff was not restricted from working based on the conditions his office treats her for.
  - His exam noted no focal neurological deficits and the ability to toe-touch, sit, stand, and lay supine without difficulty.
  - While Dr. Asprinio noted "facial grimacing" when Plaintiff switched positions, his August 13, 2019, notes also show an "unremarkable gait" and no neurological deficits.
- Dr. Mathew opined that Plaintiff could perform her occupational demands full-time, but was unable to lift above 10 lbs., or sit or stand for prolonged periods. She

13

also said Plaintiff would never regain capacity for full-time performance of these demands.

- o In a follow-up call with Unum, Dr. Mathew confirmed that Plaintiff has the capacity for the referenced physical demands.

- Dr. Wong did not complete a questionnaire based on how long it had been since Plaintiff's last visit.

- Dr. Zelazny opined that she could perform her occupational demands.

- Dr. Nanavati opined that Plaintiff did not have capacity for full-time performance of cognitive demands due to PTSD, depression/anxiety, lack of attention.

  - o Though Dr. Nanavati's notes indicate a diagnosis of post-concussion syndrome, they also reflect normal neurologic and mental status exams.

  - o Dr. Nanavati attributed worsening of executive function to worsened PTSD symptoms.

In addition to analyzing these medical opinions, Dr. Haller noted that Galvin-Bliefernich returned to full-time employment in September 2018 as a teaching assistant, worked part-time at a coffee shop, and engaged in activities such as driving, skiing, cleaning, cooking, and doing yard work. He concluded that Galvin-Bliefernich was not precluded from performing the physical demands of an alternative occupation and that she was not precluded from performing the cognitive demands of an alternative occupation based on a non-behavioral health condition. [AR 2927]. He recommended that a designated medical officer review the file.

### ii. Dr. Mirielle Diaz-Molina

Dr. Diaz-Molina is an outside DMO for Unum. Noting many of the same factors as Dr. Haller, she agreed that Galvin-Bliefernich had the "physical functional capacity" to meet the

identified occupational demands. [AR 2953-2954]. In addition, she noted that in a December 3, 2018, visit with Dr. Anthony Policastro, Plaintiff had no muscle weakness, neurological or sensory deficits, and had a full range of motion of the spine and normal gait. Regarding Plaintiff's knee pain symptoms, she noted that Plaintiff told Dr. Zelazny that she did not feel they warranted further intervention. Dr. Diaz-Molina observed that Plaintiff's most recent physical examinations showed no motor, neurological or sensory deficits, which she found to be inconsistent with an impairing condition.

Dr. Diaz-Molina also noted that although an MRI of the lumbar spine showed degenerative changes with some nerve impingement, "this does not correlate with the claimant's physical exam findings and is not consistent with the reported functional deficits." [AR 2953]. She also addressed the call with Dr. Mathew, who appeared to provide restrictions but later clarified that Plaintiff does indeed have the capacity for the identified physical work demands on a full-time basis. Dr. Diaz-Molina concluded that the clinical information did not support those R&Ls regarding Plaintiff's physical functional capacity.

### iii. Dr. Nowell

Unum retained neuropsychologist Dr. David Nowell to evaluate Plaintiff's cognitive function based on her file. [AR 2723-2724]. Dr. Nowell opined that the neuropsychological evaluation of Dr. Copans revealed largely intact cognitive functioning, with focal weakness but without a "consistent pattern of impairment in a specific domain of cognitive functioning, and without support for global cognitive impairment." [*Id.*].

### iv. Dr. Jonathan Morris

Unum held a forum at which Plaintiff's claim was discussed on August 29, 2019. [AR 2790-2793]. The forum was facilitated by Director Rich Theriault, and included Drs. Haller and

Morris. [AR 2790]. Dr. Morris opined that based on Plaintiff's history of anxiety and depression and her worsening anxiety, depression, and PTSD as reported to various treating providers, "it is medically likely that [behavioral health] factors have been significantly contributing to [claimant's] presentation." [AR 2792].

### c. Denial of Plaintiff's Claim

In a September 27, 2019, letter, Unum notified Plaintiff that it had completed its review of her claim. [AR 2978-2987]. Unum's medical review supported that she was unable to work due to conditions of PTSD, anxiety, and depression since the date of her accident. The letter explained, however, that the Policy restricts benefits for conditions that are considered mental illness to 24 months and that Plaintiff had already received 24 months of payments as of September 14, 2018. [AR 2982]. These conditions would no longer be considered in the evaluation of her claim. Unum explained that its medical review was to determine if Galvin-Bliefernich had "the ability to perform mostly sitting with brief periods of standing and walking and occasional lifting to ten pounds." [AR 2980]. After summarizing various medical records, Unum explained its determination that Plaintiff had the ability to perform less physically demand work, as well as the skills and ability to perform that work for a gainful wage. As Plaintiff was no longer considered disabled, her claim was closed.

### d. Plaintiff's Appeal

On March 25, 2020, Plaintiff appealed the denial of benefits. In addition to the foregoing medical records, Plaintiff submitted pictures of her car accident and surgery scars, a bathroom log, the sworn declaration of her husband Matthew Bliefernich, a Functional Capacity Evaluation, and a medical opinion form from Dr. Wong.

16

### i. Functional Capacity Evaluation

Plaintiff underwent a functional capacity evaluation ("FCE") at BEST Physical Therapy Associates, with Susan Greenberg, MS, PT, on March 2, 2020. [AR 3040-3069]. Ms. Greenberg determined that Plaintiff gave maximum, consistent effort, though the test duration was difficult for her "due to her low back pain and pelvic pain (which increase with sitting and activities)" as well as her overall weakness and deconditioning. [AR 3043]. The FCE catalogued numerous deficits in Galvin-Bliefernich's functional capacities, including, *inter alia*:

- Decreased ability to squat more than partially on an occasional basis (6% to 33% of day); holding on for support.

- Decreased ability to tolerate walking. She was able to ambulate for 6 minutes, but at a below average pace for her age.

- Lifting sedentary loads from an 11" surface to waist and from waist to eye level.

- Limited to 16 lbs. in front carrying, 14 lbs. for side carrying.

- Below average to significantly below average bilateral fine motor skills and below average gross motor skills.

- Decreased active range of motion, strength of trunk, and bilateral hips caused "a dysfunctional and below average paced gait pattern." Balance deficit.

- Increased lower extremity stiffness and trunk weakness, as well as pain, noted with activities requiring transitioning from modified low-level positions to erect postures. Requires external support to rise from low-level position and remain kneeling.

- Unable to tolerate forward bending in standing for more than occasional periods, frequently shifting out of position.

17

- Repetitive partial squatting limited to occasionally (6% to 33% of the day).

- Fatigues easily, especially when sitting or standing statically, and must change positions frequently (every 15-20 minutes). Standing is also limited to 20 minutes or less.

- Low back and hip pain performing seated and repetitive tasks of hand coordination testing.

- Decreased ability to perform kneeling position, required external support.

- Muscle and joint pain aggravated by dysfunctional compensatory postures.

- Unable to perform task of stair climbing secondary to hip, pelvis, and trunk weakness.

[AR 3053-54]. The FCE concludes that Galvin-Bliefernich is unable to perform her past occupation as a full-time teacher and unable to perform at a full-time sedentary physical demand level. Specifically, "she is not able to tolerate an 8-hour work day due to positional intolerances in sitting and standing," as she must change position ever 20-25 minutes when sitting and every 25 minutes when standing. [AR 3060]. Increased fatigue, deterioration of movement as tasks progress, and poor musculoskeletal endurance also preclude sedentary work.

With respect to her part-time work for the Homestead School as a teaching assistant, the FCE noted that the job is better tolerated than her prior job as a public elementary school teacher because it involves fewer students, allows access to the bathroom at all times because of the presence of other teachers, she has the ability to move around and lessons are shorter, there are fewer lessons to plan, and the school is flexible with time off. [AR 3057].

### ii. Dr. Wong's Updated Medical Opinion

After previously indicating he could not opine as to her work capacity due to the length of

time since her last visit, Dr. Wong saw Plaintiff again on September 18, 2019. [AR 6286-6287].[3] His notes indicate that her left knee had improved, but there was still some clicking and possibly locking. Plaintiff reported pain in the left lumbar area at the surgical/hernia site. He notes her pain improved but then recurred in April 2019. In his exam, he observed Plaintiff walks "with an antalgic gait" and was in moderate discomfort/pain, as indicated by her changing positions often. [AR 6287].

In a January 22, 2020, questionnaire from Plaintiff, Dr. Wong identified Plaintiff's impairing diagnoses as multi-trauma, extensive orthopedic injuries/surgeries, abdominal hernia/repair, and chronic pain. [AR 7910-7912]. In an 8-hour workday, he opined that she was physically capable of sitting for 2 hours out of the day, for 15 minutes at a time, and standing or walking for 6 hours out of the day, for 30 minutes at a time. He opined that she could lift up to 10 lbs. for at least 2/3 of the day, and 11-20 lbs. at least 1/2 of the day. According to Dr. Wong, she did not require bedrest during a normal workday.

Dr. Wong further opined that Plaintiff's problems with stamina and endurance would require her to rest more than the 30-minute break and two 15-minute breaks that are "normally allowed." [AR 7911]. He opined that her subjective complaints seemed reasonable in light of his observations and that she was in moderate pain. He opined that the degree of pain, fatigue, or other limitations she experiences would interfere with her reliably attending an 8 hour per day, 40-hour work week. He further opined that her pain, medication, or condition would reasonably be expected to cause lapses in concentration or memory on a daily basis for several hours a day. [*Id.*]. He expected chronic absences based on her reasonable medical needs. Finally, Dr. Wong indicated

---

[3] Though this visit was nine days prior to the initial denial of further LTD benefits on September 27, 2019, it appears that Unum did not have the medical records from this visit until the appeal.

that Plaintiff had tried to work five days a week, but was "unable due to limitations/pain," and now she is only able to work four days a week. [AR 7912].[4]

### e. Unum's Appeal Review

Appeals Specialist Amy Gailitis initiated a forum regarding Plaintiff's appeal with Senior VRC Kelly Marsiano, appeals physician Dr. Chris Bartlett, and nurse clinical consultant Jacqueline Ballback on April 13, 2020. [AR 7873]. VRC Marsiano evaluated plaintiff's ability to change position while performing her occupational demands, as well as bathroom-related issues. [AR 7885-7886]. She did this by reference to two gainful occupations previously identified by Unum – employment interviewer and department secretary. She noted that both allow for brief change in position from sitting to standing while performing duties such as talking on the phone. Additionally, adjustable desktop stands are available in many office settings that allow for changing position throughout the workday. She also noted that per OSHA regulations, employers are required to provide all workers with sanitary and "immediately-available" restrooms.

OSP Dr. Bartlett also reviewed the file and concluded that Plaintiff was not physically restricted from working at a sedentary demand level. [AR 7933-7937]. His review cited the medical records in significant detail, addressing behavioral health conditions, cognitive symptoms, chronic pain, knee pain, GI symptoms, and "whole person" perspective. He noted, for example, that her treating orthopedic surgeon did not believe she was restricted from working based on the conditions he treated her for and that her neuropsychological evaluation demonstrated no significant cognitive impairment. Dr. Bartlett did not find support for a chronic pain disorder, noting that most exams showed her to be in no distress and her analgesic requirements were limited to NSAIDs and Celebrex. He also noted her reported activities, including interstate driving and

---

[4] This was apparently incorrect. Unum states – and Plaintiff does not dispute – that she switched to part-time work due to a decline in enrollment at the school. [*See* Doc. 66 n.1; AR 2758].

working part-time, which he found to be inconsistent with global impairment from severe chronic pain. With respect to GI symptoms, he noted her work history, interstate drives, and the fact that her GI symptoms did not appear to interfere with physical therapy or the FCE.

Dr. Bartlett also reviewed the FCE and Dr. Wong's opinion provided on appeal. As to the FCE, he noted the testing was conducted 5 months after the September 15, 2019, date of interest, so the results "may not help us understand her functional capacity as of 09/15/2019." [AR 7936]. He found that while sitting intolerance was noted, these findings were inconsistent with her reported ability to drive for 7 hours a day in a trip from New York to Louisiana, and also inconsistent with her ability to work as a teacher's assistant. He found Plaintiff's reported level of activity to be more consistent with a sedentary functional capacity.

Based on these reviews, Appeals Specialist Gailitis wrote a May 7, 2020, letter to Plaintiff's counsel indicating the claim decision was being upheld.

## II.    STANDARD OF REVIEW

This action arises from a determination of benefits under a plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. Courts ordinarily review ERISA claims decisions *de novo*, but if the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the benefit determination is reviewed under an arbitrary and capricious standard. *Goetz v. Greater Georgia Live Ins. Co.*, 649 F. Supp. 2d 802, 811 (E.D. Tenn. 2009); *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003).

A decision is not arbitrary and capricious if it is possible to offer a reasoned explanation for the decision based on the evidence. *McDonald*, 347 F.3d at 169; *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). The arbitrary and capricious standard "is the least demanding

form of judicial review of administrative action," but it is not toothless. *Id*. Rather, it requires the Court to "decide whether the plan administrator's decision was rational in light of the plan's provisions." *Id.* (quoting *Williams*, 227 F.3d at 712). Courts must scrutinize the decision to determine whether, "substantively or procedurally, [the plan administrator] has abused his discretion." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). In other words, the administrator's decision will be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 667 (6th Cir. 2006). Significantly, an administrator's decision is not arbitrary and capricious when it relies on "the medical opinion of one doctor over that of another," because the administrator has articulated a reasoned explanation for its decision. *McDonald*, 347 F.3d at 169.

On the other hand, an administrator's decision may be found arbitrary and capricious where, for example, the administrator ignored key pieces of evidence, selectively reviewed the evidence it did consider from the claimant's treating physicians, or failed to conduct a physical examination while relying heavily on non-treating physicians. *Shaw v. AT&T Ben. Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015).

In some cases, a conflict of interest arises because the administrator both decides benefits eligibility and pays the benefits. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). That circumstance does not change the standard of review. *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 292-93 (6th Cir. 2005); *Myers v. Prudential Ins. Co. of Am.*, 581 F. Supp. 2d 904, 909-10 (E.D. Tenn. 2008) (discussing *Calvert*). Rather, it becomes a factor the court must consider when determining whether the plan administrator's denial of benefits was arbitrary and capricious. *Calvert*, 409 F.3d at 292-93.

### III.   ANALYSIS

#### a.   Positions of the Parties

The parties filed cross-motions for judgment on the ERISA record. Plaintiff separately filed a Motion to Determine Extent of Deference [Doc. 55] and over 1,000 pages of exhibits in support of that motion. As will be explained in detail below, there is no colorable legal argument that the Court should review the instant motion under anything other than an arbitrary and capricious standard of review. In keeping with clear guidance from the Supreme Court of the United States and the United States Court of Appeals for the Sixth Circuit, the bias Plaintiff alleges in this motion will be considered as but one factor in the Court's review.

Based on the medical opinions of Plaintiff's treating providers, specifically Drs. Mathew, Asprinio, and Zelazny, and the file reviews of Drs. Haller, Bartlett, and Diaz-Molina, Unum maintains that Plaintiff was not physically precluded from sedentary work activity. While Unum believes the FCE was late, it contends that the FCE was considered and found to be inconsistent with Plaintiff's reported activity and other medical findings. Unum discounts the opinion of Dr. Wong as unsupported by any clinical notes or other supporting documentation.

Based on her medical records generally, the opinion of Dr. Wong, the FCE, and the MRI results, Plaintiff asserts she was disabled from a sedentary occupation. Plaintiff argues that Unum relied on file-reviewing physicians, discounting both the opinions of her treating providers and Plaintiff's subjective reports of pain. Plaintiff argues that Unum also failed to consider the limitations identified by the physicians that nonetheless opined she was able to perform the identified occupational demands, and that it ignored how the frequency of bowel movements would interfere with her ability to work.

### b. Unum's Decision Is Supported by the Opinions of Plaintiff's Treating Physicians and File-Reviewing Physicians.

Unum relied on ample evidence in Plaintiff's medical records that she was not physically disabled from a sedentary occupation. First, Unum relied on the opinions of several of Plaintiff's treating providers. Dr. Asprinio performed Plaintiff's pelvic repair surgeries and repeatedly noted that she was free to continue all activities on an as-tolerated basis. [AR 1367, 2627]. His most recent notes indicate that her pain complaints were "out of proportion" to findings on physical examination, radiographs, and an MRI of the lumbar spine. [AR 2839]. Plaintiff's primary care provider likewise opined that she was capable of performing her alternative occupational demands. [AR 2069]. Her questionnaire listed some restrictions, including that she was unable to lift above 10 lbs. or sit or stand for a prolonged period. [*Id.*]. But in a follow-up call with Unum, she confirmed her opinion that Plaintiff had the physical capacity for full-time sedentary work. [AR 2904-2905].

Dr. Zelazny, an orthopedic surgeon who performed Plaintiff's pelvic surgery and also treated her for knee pain, likewise opined that she could perform her occupational demands on a full-time basis. [AR 2293-2294]. He noted that walking/moving were preferable to long periods of sitting and advised that she rely on another teacher in the classroom for assistance. In a subsequent visit, Plaintiff reported that her knees had improved and that she had no buckling, locking, or instability. [AR 2374]. She had muscle aches and weakness, but no back pain, and had full extension of her legs. While she had some degenerative changes in her right knee, Plaintiff declined further intervention, feeling that her symptoms did not warrant any. Likewise, Plaintiff's gastroenterologist Dr. Nici confirmed to Unum that he did not have her on any work restrictions. [AR 2784].

Second, Unum relied on the file reviews of OSP Dr. Haller, outside Designated Medical Officer Dr. Diaz-Molina, and Dr. Bartlett. Each of these doctors opined that Plaintiff's file as a whole did not support a finding of physical disability from sedentary occupation and explained why. In particular, Dr. Haller explained that while Dr. Nanavati opined that Plaintiff was not able to meet her occupational demands, his notes indicated normal neurologic and mental status exams, and attributed worsening executive function to PTSD. [AR 2925-2927]. Dr. Diaz-Molina noted that while her MRI showed degenerative changes and some nerve impingement, this did not correlate with the physical exam findings and was not consistent with reported functional deficits. [AR 2953]. Similarly, Dr. Bartlett summarized Dr. Wong's opinion and restrictions, but noted his R&Ls were out proportion to the normal neuropsychological testing, her pain medication, and her largely normal physical exams by other doctors. [AR 7934]. Dr. Bartlett also noted Dr. Asprinio's opinion that her pain complaints were out of proportion to findings on physical examination, radiographs, and an MRI of the lumbosacral spine. [*Id.*]. All three doctors noted that Plaintiff's activities – skiing, interstate driving, exercise, yard work, etc. – were in excess of sedentary work demands.

Finally, Unum points to the activities Plaintiff reported to her treating providers and Unum representatives, finding them inconsistent with the inability to meet her sedentary occupational demands. Plaintiff reported doing yardwork, small projects around the house, skiing on one occasion, exercising, and driving up to 7 hours a day on an interstate road trip, in addition to working full-time and then part-time. Unum was permitted to consider these activities, particularly where treating surgeon Dr. Asprinio noted her pain complaints were disproportionate to his findings on physical exam.

### c. Plaintiff has not Demonstrated that Unum was Arbitrary or Capricious.

#### i. Evidence Supporting Disability

Plaintiff urges she was in fact disabled based on her medical history generally, the FCE, the opinion of Dr. Wong, and certain MRI results. But "one medical doctor's opinion is not more valid than another's." *Sandeen v. Paul Revere Life Ins. Co.*, Case No. 1:18-cv-248, 2022 WL 966848, *15 (E.D. Tenn. March 30, 2022) (citing *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.*, 419 F.3d 501, 510 (6th Cir. 2005)). Certainly, "a plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting alternative options." *Elliot v. Metropolitan Life Ins.*, 473 F.3d 613, 620 (6th Cir. 2006) (finding denial of benefits arbitrary and capricious). But here, Unum did not summarily reject the opinion of Dr. Wong. Rather, it relied on the opinions of Plaintiff's other treating physicians, including two of her surgeons and her primary care physician, and explained its disagreement with Dr. Wong. As Unum points out, Dr. Wong's disability opinion was also not accompanied by objective medical evidence. And the Sixth Circuit has held that a lack of objective medical evidence upon which to base a treating physician's opinion is a sufficient reason for an administrator's choice not to credit that opinion. *Curry v. Eaton Corp.*, 400 F. App'x 51, 59 (6th Cir. 2010).

As the Sixth Circuit has explained, the "Court's job . . . is not to decide which conclusion was more credible or reasonable; instead, this Court decides only whether it is 'possible to offer a reasoned explanation, based on the evidence,' for Unum's decision." *Holden v. Unum Life Ins. Co. of Am.*, Case No. 20-6318, 2021 WL 2836624, *15 (6th Cir. July 8, 2021) (benefits determination based on file reviewing physician opinion was not arbitrary and capricious where, *inter alia*, reviewer "explicitly acknowledged and explained their disagreement" with other physician's contrary conclusion); *Killen v. Reliance Standard Life Ins. Co.*, 776 F.3d 303, 307 (5th Cir. 2015)

("The fact that the evidence is disputable will not invalidate the decision; the evidence need only assure that the administrator's decision fall[s] somewhere on the continuum of reasonableness – even if on the low end."). Here, Unum explained its disagreement with the FCE and Dr. Wong's opinion and supported its decision by reference to the opinions of Plaintiff's treating physicians – Drs. Asprinio, Mathew, and Zelazny – as well as that of reviewing physicians Drs. Haller, Bartlett, and Diaz-Molina. As for the MRI results, Plaintiff fails to explain how the results demonstrate disability.

### ii. Adequacy of File Reviews & Alleged Credibility Determination

For similar reasons, Unum's reliance on file reviews is not a significant factor in the Court's analysis. First, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). Instead, "the Sixth Circuit has found a file-only review arbitrary and capricious where there was significant objective medical data in the record to support a disability or where the reviewer did not adequately consider the record." *Gilrane v. Unum Life Ins. Co. of Am.*, No. 1:16-cv-403, 2017 WL 4018853, *8 (E.D. Tenn. Sept. 12, 2017). Neither of these circumstances are present here. Plaintiff argues that Unum's decision was arbitrary and capricious because it "unreasonably relied on unsupported in-house, file-reviewing doctors to discredit the opinions of Ms. Galvin-Bliefernich's treating providers and an independent provider." [Doc. 60 at 21]. Yet Plaintiff offers no factual support for this assertion. Nor could she, as Unum in fact relied on several of Plaintiff's own treating physicians, who opined that Plaintiff was not disabled from sedentary work. Other than Dr. Wong, not one of Plaintiff's treating physicians opined that she was unable to perform the physical occupational demands of sedentary work. *See Sandeen v. Paul Revere Life Ins. Co.*, 2022 WL 966848, *15 (E.D. Tenn. March 30, 2022) ("A fatal flaw to

Plaintiff's argument is that Defendants' decision and file reviewers did not contradict all of her medical providers.").

Relatedly, the Sixth Circuit has "taken exception" to file reviews "in situations where the file review concludes the claimant is not credible without having actually examined him or her." *Judge v. Metro. Life Ins. Co.*, 710 F.3d, 651, 663 (6th Cir. 2013). The court will not "credit a file review to the extent that it relies on adverse credibility findings when the files do not state that there is a reason to doubt the applicant's credibility." *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547 (6th Cir. 2008); *see also Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005) (rejecting opinion of file reviewing physician that plaintiff's claims were exaggerated, without explaining disagreement with treating physicians).

Plaintiff contends Unum made just such an adverse credibility determination here. According to Plaintiff, Ms. Galvin-Bliefernich's primary debilitating symptom is pain from her many medical conditions. Plaintiff argues Unum disregarded this pain and ignored the limitations/adjustments she had to make in order to engage in certain activities, such as taping and icing her knees and taking medications to reduce inflammation. [AR 2328]. Unum's appeal denial letter, for example, notes that Plaintiff was not taking high dose pain medication and reported working full-time as a teaching assistant and the ability to ski, drive, clean, cook, and do yard work. [AR 2981].

The Court is not persuaded that Unum made an impermissible adverse credibility determination here. First, Plaintiff makes no effort to explain how Unum's analysis "has all the hallmarks *Calvert*, *Kalish*, *Smith*, and *Moon* found significant with the inadequacy of non-examining medical opinions." [Doc. 73 at 9]. None of these cases involve a file review that relied

on the opinion of not one but three of the claimant's treating physicians.[5] In *Calvert*, for example,

the file reviewing physician found the claimant's reported pain and limitations in range of motion

to be subjective exaggerations, despite never having examined her and despite objective

documentation via x-rays and CT scans, which the doctor never mentioned. 409 F.3d 286, 296-97.

His opinion was also contrary to that of her treating physicians, a fact he never addressed. *Id.*; *see*

*also Bennett*, 514 F.3d at 555 (file reviewer concluded claimant exaggerated her test performance

without examining her and without any evidence of malingering, and failed to explain why he

reached decision contrary to claimant's treating physicians). In contrast, the Sixth Circuit has

found no issue with a file review that makes no credibility determinations and does not second-

guess the treating physicians, but instead simply echoes the findings of the claimant's doctors,

notes where the reports lack objective medical evidence, and points out internal inconsistencies.

*Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013).

Unum did not reject but in fact <u>relied on</u> the opinions of several of Plaintiff's doctors who

concluded she was physically able to meet sedentary occupational demands. This included the

opinion of Plaintiff's surgeon, who determined that her pain complaints were "out of proportion"

to his findings on physical examination, radiographs, and an MRI of the lumbosacral spine. [AR

2839]. And Plaintiff has cited no authority for the proposition that Unum could not consider the

extent of her activities, many of which appear in her medical records. Because of the nature and

severity of Plaintiff's injuries, her treating providers documented her physical recovery, noting her

gait, ability to walk and stand, and range of motion. They were aware of her pain, discussed it with

---

[5] *See Kalish v. Liberty Mutual/ Liberty Life Assurance Co. of Boston*, 419 F.3d 501 (6th Cir. 2005) (file reviewing physician did not explain disagreement with treating physician); *Smith v. Continental Cas. Co.*, 450 F.3d 253 (6th Cir. 2006) (file reviewing physician did not fully review treating physician's opinion and made adverse credibility determination regarding claimant's pain); *Moon v. Unum Provident Corp.*, 405 F.3d 373 (6th Cir. 2005) (only medical opinion contrary to primary treating physician's was that of Unum's file-reviewing physician).

her, and in some instances, recommended or referred her for further testing, physical therapy, or pain management. Unum relied on these opinions and first-person impressions in rendering its decision. Given that her own doctors noted her activities and still opined that she was not disabled, Unum was not obligated to ignore that certain of these activities, e.g. driving long distances, were inconsistent with Plaintiff's purported inability to sit for longer than 20 minutes.

### iii. Selective Review of Restrictions & Limitations and Activities

Plaintiff maintains that Unum failed to consider the restrictions and limitations provided by her treating physicians, including the R&Ls provided by physicians who opined she was not disabled from sedentary work. [Doc. 73 at 5]. She summarizes the opinions of psychologist Heather Carpenter-Sarmiento, neurologist Dr. Nanavati, primary care provider Dr. Mathews, and surgeon Dr. Zelazny, noting their purported R&Ls. Plaintiff asserts: "[t]he forms listed above list several restrictions and limitations that would prohibit Ms. Galvin-Bliefernich from performing a full-time sedentary job." [Doc. 73 at 6].

Yet Plaintiff never identifies which restrictions or limitations prohibit her from performing any given physical or cognitive demand. Indeed, it is not entirely clear that all the comments she points to relate to her physical capacity to perform her occupational demands, as opposed to general suggestions or behavioral health limitations.[6] The Court is not obligated to flesh out this argument on Plaintiff's behalf. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (citation omitted)).

---

[6] For example, Dr. Zelazny recommended that Plaintiff rely on another teacher in the classroom for assistance when needed. This relates to her occupation as a teacher / teacher's assistant, but is not obviously a limitation/restriction in her broader work capacity.

Moreover, Drs. Mathew and Zelazny both gave their purported R&Ls in the context of opining that Plaintiff <u>could</u> perform her occupational demands. Dr. Mathew later confirmed this in a call to Unum. And Dr. Zelazny's opinion that walking/moving was better for Plaintiff than sitting does not obviously conflict with these alternative occupational demands, which allowed for standing up briefly between tasks, and involved standing or walking for brief periods of time. As to Ms. Carpenter-Sarmiento, she never opined that Plaintiff is physically disabled from full-time sedentary work. [AR 2045-2046]. In fact, she wrote to Unum to "corroborate her request to continue to work in her current capacity" as a teacher's assistant. [AR 2046]. A clinical psychologist, her opinions relate to Plaintiff's behavioral health conditions, rather than physical abilities. As to Dr. Nanavati, Unum OSP Dr. Haller noted that he attributed the worsening of Plaintiff's executive function to worsening PTSD. [AR 2926]. So Plaintiff has not shown that Unum failed to consider the restrictions and limitations identified by her treating providers as to her physical work capacity.

#### iv. Functional Capacity Evaluation

Next, Plaintiff argues at length that Unum improperly disregarded the results of the FCE because it was not time-relevant. The FCE was conducted five months after the relevant benefits determination period ended on September 15, 2019, and was submitted only on appeal. In addition to noting the FCE's untimeliness, Dr. Bartlett gave substantive reasons for his disagreement with the results of the FCE. [AR 7936]. For example, the FCE states that Plaintiff cannot sit for more than 20 minutes at a time, but Plaintiff reported that she drove from New York to Louisiana round trip, with up to 7 hours a day of driving. This limitation is also obviously at odds with the opinions of Drs. Mathew and Asprinio that she could perform a job that is mostly sitting. Her records also indicated that she cooks, cleans, and does a lot around the house, but has to wear a back brace, that

she went skiing the previous winter, and does small projects such as painting or putting up shelves. Dr. Bartlett credited the opinions of Drs. Asprinio, Zelazny, and Mathew, as well as Plaintiff's own report of her physical abilities, over the findings of the FCE.

Moreover, the FCE documented what appear to be entirely new medical findings: below average to significantly below average bilateral fine motor skills and below average gross motor skills. This finding makes it reasonable for Unum to have accorded the FCE less weight, because it suggests Plaintiff's medical situation might have changed after the relevant time period. *Cf. Boersma v. Unum Life Ins. Co. of America*, 546 F. Supp. 3d 703 (M.D. Tenn. 2021) (on *de novo* review, late functional capacity test could be relevant where there was no evidence condition documented was meaningfully different from condition at the time of benefits application).

Finally, the FCE does not indicate when the symptoms documented therein arose or state that they arose during the benefits determination period. Where courts have found fault with an administrator's failure to consider medical records created after the benefits termination date, this has been a significant factor. *See Fontana v. Guardian Life Ins.*, No. C 08-01231, 2009 WL 73743 (N.D. Cal. Jan. 12, 2009) (file reviewing physician gave no reason for rejecting a report generated five months after the benefits termination date, which report specifically opined that plaintiff's disability existed at the relevant time); *Thompson v. Standard Ins. Co.*, 167 F. Supp. 2d 1186 (D. Oregon 2001) (on *de novo* review, multiple doctors opined that the claimant's symptoms existed as of relevant date); *Woo v. Deluxe Corp.,* 144 F.3d 1157 (8th Cir. 1998) (applying a "less deferential" standard of review to find plan administrator improperly rejected the opinion of all claimant's treating physicians that connected her physical problems during the insured period to a later diagnosis).

### v. Gastrointestinal Issues

Finally, Plaintiff has not shown how her gastrointestinal issues relate to her work capacity. Plaintiff's log and reports to medical providers indicate that she suffers from both diarrhea and constipation, and at times has bowel movements six to eight times a day. [AR 1587; AR 6352-6357; AR 7947]. Unum VRC Marsiano noted that OSHA regulations require immediate access to a restroom for all workers. [AR 7886]. But Plaintiff argues Unum misunderstood the problem, which is not bathroom access but being distracted from work multiple times a day while using the restroom. But Plaintiff presented no evidence to support this argument, for example, how much time she would have to be away from her desk during an 8-hour day. Plaintiff's gastroenterologist, Dr. Nici, saw her for this condition, and he confirmed to Unum that he did not have her on any work restrictions. [AR 2784].

### d. Motion to Determine Extent of Deference & Conflict of Interest

Plaintiff separately filed a Motion to Determine Extent of Deference [Doc. 56], arguing that the extent to which Unum's conflict of interest impacts its decision-making requires the Court to give little, if any, deference to Unum's decision. Plaintiff's arguments in this regard are analytically inseparable from her Motion for Judgment on the ERISA Record [Doc. 59]. By filing the deference motion separately, Plaintiff has improperly gained the benefit of significantly expanded briefing on an issue that should have been addressed in her dispositive motion briefing. Plaintiff also filed over 1,200 pages of exhibits in connection with her motion and reply brief.

It is abundantly clear that any conflict of interest has no impact on the standard of review. "While several courts have altered the standard of review to something less deferential than the arbitrary and capricious standard where a benefits administrator is operating under a conflict of interest . . . this Court has not taken that approach." *Calvert*, 409 F.3d at 293; *see Metropolitan*

*Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) ("We do not believe that *Firestone's* statement implies a change in the *standard* of review, say, from deferential to *de novo* review"); *Tate v. Gen. Motors LLC*, 538 F. App'x 599, 601 (6th Cir. 2013) ("This standard is not altered by GM's inherent conflict of interest created by acting as both the administrator and issuer of the Plan, but we consider it a factor in determining whether the plan administrator's decision was arbitrary and capricious." (cleaned up)). Rather, "the standard remains unchanged and the conflict of interest is to be considered in *applying* that standard." *Id.* This Court has repeatedly rejected attempts to alter the standard.[7] Accordingly, the Motion to Determine Extent of Deference [Doc. 56] is **DENIED**, but the Court will evaluate Plaintiff's arguments in connection with her motion for judgment on the ERISA record.

The Supreme Court has provided guidance on how to do so. When a plan administrator both evaluates claims for benefits and pays benefits claims, there is an inherent conflict of interest. *Metropolitan Life*, 554 U.S. at 112. This is because every dollar paid in benefits is a dollar spent by the employer, while every dollar saved is a dollar the employer retains. *Id.* Such a conflict is but one of several considerations that judges must review in evaluating the lawfulness of a benefits denial. *Id.* at 117. Conflict of interest "should prove more important . . . where the circumstances suggest a higher likelihood that it affected the benefits decision, including . . . cases where an insurance company administrator has a history of biased claims administration." *Id.* Yet it will prove less important, "perhaps to the vanishing point," where the administrator has taken "active steps to reduce potential bias and promote accuracy, for example, by walling off claims

---

[7] *See Frost v. Unum Life Ins. Co. of Am.*, Case No. 1:21-cv-269, 2023 WL 2261415 (E.D. Tenn. Feb. 14, 2022) (assessing conflict of interest as a factor in applying arbitrary and capricious standard); *Sandeen v. Paul Revere Life Insurance Company*, Case No. 1:18-cv-248, 2002 WL 966848, *13 (E.D. Tenn. March 30, 2022) (treating motion to determine deference as a "supplement" to plaintiff's motion for judgment); *see also Yates v. Bechtel Jacobs Co., LLC*, Case No. 3:09-cv-51, 2011 WL 1157694 (E.D. Tenn. March 28, 2011) ("While conflict of interest is a factor to consider, it does not change the standard of review.").

administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.*

Following *Metropolitan Life Insurance v. Glenn*, the Sixth Circuit continues to "require[] a plaintiff not only show the purported existence of a conflict of interest, but also to provide 'significant evidence' that the conflict actually affected or motivated the decision at issue." *Holden v. Unum Life Ins. Co. of Am.*, Case No. 20-6318, 2021 WL 2836624, *17 n.21 (6th Cir. July 8, 2021) (quoting *Cooper v. Life Ins. Co. of N. Am.* 486 F.3d 157, 165 (6th Cir. 2007)). The Sixth Circuit has recently explained that conclusory allegations of bias "do not deserve much weight." *Autran v. Proctor & Gamble Health and Long-Term Disability Benefit Plan*, 27 F.4th 405, 418 (6th Cir. 2022). "A participant should instead attempt to uncover evidence suggesting that the conflict materialized in a concrete way to influence the administrator's decisional process." *Id.*

Plaintiff has not produced such evidence here. Plaintiff argues that Unum has a history of biased claim administration, continues to target claims to meet its financial goals on a company-wide basis, and that this recovery pressure impacted Ms. Galvin-Bliefernich's claim. Yet the majority of Plaintiff's argument has nothing to do with the administration of her claim, but instead relates to Unum's regulatory non-compliance in the 1990s and deposition testimony from employees and former employees who indisputably had no part in the administration of Plaintiff's claim on any level. In the absence of any connection between this evidence and the denial of Plaintiff's claim, the Court instead focuses on the portions of Plaintiff's argument that could conceivably relate to bias in the handling of her claim.

First, Plaintiff argues that claim Director Richard Theriault was provided with a Weekly Tracking Report ("WTR") from Unum's financial department and that this created recovery pressure in his review of Plaintiff's claim. As Unum explains, the WTR includes actual and

projected data points for, *inter alia*, claim recoveries. [Doc. 64 at 4]. The WTR does not include

specific dollar amounts or the financial impact of claims being paid or closed, but reflects claim

count numbers. [*Id.*]. Director Theriault participated in forum discussions regarding Plaintiff's

claim and approved the DBS recommendations on her claim. [*See* Doc. 64 at 4-5]. No one else

involved in claims handling had access to the WTRs and Director Theriault did not share the data

with the people on his claim team. [Doc. 64-2 at 22]. In his deposition, Mr. Theriault testified that

he could not remember the last time he looked at the WTR. [*Id.* at 14]. He further testified that he

had not been pressured to deny valid claims, that he had never pressured anyone on his claims

team to deny claims in order to meet a claim metric, and that his compensation was not dependent

in any way on the number of claims that his team pays or denies. [*Id.* at 24].

      Moreover, the two primary pieces of evidence in support of disability were reviewed by

individuals who were not on Theriault's claims team and who also had no access to the WTR.

Neither the disability opinion of Dr. Wong nor the FCE were submitted until the appeal. Appeals

Specialist Amy Gailitis recommended Unum's decision be upheld on appeal and Quality

Compliance Consultant Marie Sullivan approved the decision. [AR 7940]. Neither had access to

the WTRs or any similar claims metric data. [Doc. 64-1 at ¶ 4]. So even if Theriault had access to

"financial" data, two of the most significant pieces of evidence presented by Plaintiff were

reviewed only by people outside his claims team.

      Next, Plaintiff contends that Unum's reliance on file reviews is evidence of bias. The Court

fails to see how Unum's reliance on file reviews that are consistent with the opinions of many of

Plaintiff's treating physicians is indicative of bias. Again, the only treating physician who opined

that Plaintiff was physically disabled from sedentary work was Dr. Wong. Plaintiff insists that

Unum did not consider the R&Ls provided by her other physicians, but fails to show how these

R&Ls render her incapable of performing her alternative occupational demands. And this argument ignores the reality that Drs. Asprinio, Mathew, and Zelazny opined that Plaintiff was able to perform her occupational demands despite these R&Ls. If these doctors believed that, e.g., Plaintiff's need to move around rendered her unable to perform a job that is "mostly sitting," presumably they would not have opined that she was able to meet her occupational demands. Unum was not arbitrary and capricious for taking these physicians at their word.

The record reflects that multiple Unum employees reviewed Plaintiff's claim. Unum obtained file reviews from two Unum physicians and outside Designated Medical Officer Diaz-Molina. Unum also sent work capacity questionnaires to treating physicians Dr. Asprinio, Dr. Mathew, Dr. Zelazny, Dr. Nanavati, and Dr. Wong. Three of these doctors opined that Plaintiff was able to perform the occupational demands Unum identified. In addition, gastroenterologist Dr. Nici informed Unum that he did not have Plaintiff on any restrictions, while Dr. Policastro referred Unum to his notes, which reflected that Plaintiff should continue to transition to full activity. The record also reflects that Unum contacted or attempted to contact Plaintiff's physicians on numerous occasions. Finally, while Unum initially denied Plaintiff's claim as late, it ultimately paid 36 months of benefits. Accordingly, the Court finds that Unum's inherent conflict of interest is entitled to little weight in this case.

## IV. CONCLUSION

The "Court's job . . . is not to decide which conclusion was more credible or reasonable; instead, this Court decides only whether it is possible to offer a reasoned explanation, based on the evidence, for Unum's decision." *Holden v. Unum Life Ins. Co. of Am.*, Case No. 20-6318, 2021 WL 2836624, *15 (6th Cir. July 8, 2021) (internal citation omitted). Based on the evidence as a whole, there was a reasoned basis for Unum's denial of Plaintiff's LTD claim. As the Sixth Circuit

37

has explained, an administrator's decision is not arbitrary and capricious when it relies on the medical opinion of one doctor over that of another, because the administrator has articulated a reasoned explanation for its decision. *McDonald*, 347 F.3d at 169. Here, Unum relied on the opinions of several of Plaintiff's treating physicians, file reviews by physicians employed by or engaged by Unum, and Plaintiff's reported activity levels in determining that she was not physically disabled from sedentary work. Unum's decision was not arbitrary or capricious.

Accordingly, Plaintiff's Motion to Determine Extent of Deference [Doc. 55] is **DENIED**. Plaintiff's counsel is put **ON NOTICE** that future motions of this nature will be summarily denied unless included in the dispositive motion briefing and supported by citation to legal authority.

It is **FURTHER ORDERED** that Plaintiff's Motion for Judgment on the ERISA Record [Doc. 59] is **DENIED**, Defendant's Motion for Judgment as a Matter if Law [Doc. 65] is **GRANTED**, and this case is **DISMISSED WITH PREJUDICE**. A separate judgment shall enter.

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**